**JESS EDWARDS, INC., Appellant,**

v.

**Johnny R. FOLEY, Appellee.**

**No. 3611.**

Court of Civil Appeals of Texas.

Waco.

Feb. 12, 1959.

Phinney & Hallman, Dallas, M. L. Bennett, Jr., Normangee, Ralph W. Pulley, Jr., Carl L. Phinney and Leroy Hallman, Dallas, for appellant.

Caldwell, Baker, Jordan & Hill, Dallas, for appellee.

TIREY, Justice.

Jess Edwards, Inc., has perfected its appeal from an order overruling its plea of privilege to be sued in Nueces County, the county of its residence. There was no request for Findings of Fact and Conclusions of Law, and none filed. The judgment is assailed on one point. It is: "The trial court erred in overruling appellant's plea of privilege and maintaining venue in Leon County, for the reason that such holding is contrary to the sufficient evidence of probative force in the record and/or is contrary to the overwhelming preponderance of the evidence."

Appellee went to trial on his Original Petition and his Amended Affidavit Controverting the Plea of Privilege of defendant. Appellee brought this suit for damages resulting to his wife in an automobile collision, and pertinent to this discussion, he alleged substantially that in January, 1956, his wife undertook to drive the family car from her place of work to her home in Jewett, Texas, and that as she was crossing Highway 79 in the town of Jewett, there approached from her right on such highway one of defendant's trucks and trailers, being operated by William H. Dunn; that such truck driver, acting in the scope of his authority, was operating such truck at a high and dangerous rate of speed and without keeping a proper look-

out; that he failed to keep his truck under proper control, and that as Mrs. Foley crossed the highway ahead of the driver, he turned the course of his truck to the right and on to the intersecting roadway, colliding with the side of plaintiff's automobile some 16 feet off the paved portion of the highway, and that in such collision, his wife sustained serious, painful and permanent bodily injuries, and that his automobile was badly damaged and broken. Plaintiff alleged specifically that the defendant's truck driver was guilty of negligence proximately causing the injuries in the following respects: (a and b) that he operated the truck at a greater rate of speed than a person of ordinary prudence would have done under the same or similar circumstances and that he operated such truck in excess of 45 miles an hour, in violation of law; (c) that he failed to keep a proper lookout; (d) that he turned the course of his truck to the right and off of the paved portion of the highway, causing it to collide with plaintiff's automobile after plaintiff's car had cleared the intersection; (e) that he failed to have his truck under proper control; (f) that he failed to yield to plaintiff's automobile the right-of-way, to which it was entitled at the time in question; (g) that he failed to reduce the speed at which his truck was traveling, as he approached the intersection; (h and i) that he failed to apply his brakes and failed to bring his truck to a stop before colliding with plaintiff's car.

Appellee, in his controverting affidavit, adopted the allegations, in his Original Petition in its entirety, and made it a part of this affidavit for all purposes, and averred that the allegations therein contained are true and correct, and further alleged that the controversy arose from the negligent operation of the automobile in Leon County by one of defendant's servants, acting in the course of his employment. The controverting affidavit further specifically alleged that the acts and conduct of said defendant, acting through his servant and employee, coupled with the driving of such truck into the automobile of plaintiff, as recited in its petition, constitutes a crime, offense and trespass by the defendant and its agent and representative, within the meaning of paragraph 9 of Art. 1995 of the Revised Civil Statutes of Texas, Vernon's Ann.Civ.St. art. 1995, subd. 9, such trespass or crime or offense occurring within the County of Leon, State of Texas, the place where such suit was brought, and that said action is also maintainable in Leon County, Texas by virtue of Subdiv. 9a of Art. 1995, Rev.Civ.Stats., and that such acts of negligence having occurred in Leon County, Texas, such suit is maintainable in Leon County, Texas.

■ There was no exception to Appellee's Original Petition, nor to the controverting affidavit, and in the absence of exceptions to the petition and to the controverting affidavit, each will be liberally construed in the pleader's favor. See Scott v. Gardner, 137 Tex. 628, 156 S.W.2d 513, Pts. 1 and 2, 141 A.L.R. 50. See also Ladner v. Reliance Corp., Tex., 293 S.W.2d 758.

It was stipulated that for the purpose of the hearing on the plea of privilege between the parties, that on the occasion in question Jess Edwards' truck involved in the collision was being operated by William Dunn, who was on such occasion actually in the course and scope of his employment for the defendant herein.

Plaintiff tendered James K. Hall as a witness in his behalf. He testified to the effect that he was an eyewitness to the accident; that Highway 79 runs in an easterly and westerly direction with the town of Jewett in Leon County, and the plat tendered in evidence shows that Highway 79 intersects the main street of Jewett at substantially right angles; that he was a school bus driver and that he was on Highway 79 some distance back from the intersection of the highway with the main street, and while there, he saw Mrs. Foley get in her car at Ellis' Cafe, a short distance from the intersection, and drive along the south side of Highway 79 and pull up to

the intersection and stop; that just prior to the time that Mrs. Foley stopped her car at the intersection, one of defendant's trucks, which will be designated as No. 1, passed him on the highway going in a westerly direction; that when Mrs. Foley brought her car to a stop, another truck belonging to defendant, which we will designate as No. 2, was proceeding in a westerly direction on Highway 79, and at the time that Mrs. Foley stopped, truck No. 2 was passing in front of her; that at that time the witness observed a third truck some 250 or 300 feet east of the intersection on Highway 79, traveling in a westerly direction, and that Mrs. Foley attempted to cross the highway in front of this truck; that as she pulled into the intersection, truck driver No. 3 began to blow his horn. Mr. Hall testified in part as follows:

"Q. You were driving a regular school-bus; is that right? A. Yes sir.

"Q. When did you first notice the Jess Edwards truck that was involved in the collision, Mr. Hall? A. I saw him coming down the highway.

"Q. Did you see his truck or Mrs. Foley's car first? A. Mrs. Foley's car was first and then the truck came.

"Q. Where did you see Mrs. Foley's car at the time you saw the truck? Where was her vehicle? A. She stopped. There was another truck ahead of this truck. This was the third truck that hit her. There was another one ahead of her and when she pulled up to the curb to stop that truck went by and she started across.

"Q. You saw three Jess Edwards trucks? A. Yes sir, three right there. There were a convoy in all.

"Q. There was one passed you shortly after you pulled away from Mr. Foley's station? A. Yes sir.

"Q. And when did the other one pass you? The second truck? A. I met it right in the main drag just before I pulled over here (indicating) and stopped.

"Q. How far was that from the intersection that you met the second Jess Edwards truck? A. 150 or 200 feet.

"Q. So that you were between the place you have marked as your automobile or box with the name 'Hall' in it and the intersection when that second truck passed you; is that right? A. That's right. I was along about here (indicating) when Dell backed from the cafe. I come right about here (indicating) and pulled over and stopped.

"Q. What was the occasion for pulling over and stopping, Mr. Hall? A. This other truck was coming when Dell started across just below Ellis's Cafe and he just set down on his horn and I knew something was going to happen.

"Q. That's the third truck you are talking about? A. That's the third truck.

"Q. And that was about the same time the second truck passed you; is that right? A. Yes sir.

"Q. Is this level highway in here (indicating) all the way through? A. Yes sir.

"Q. Could you see the third Jess Edwards truck that was involved in the collision over the second truck, Mr. Hall? By looking over the truck? A. The second truck was done come by me.

"Q. So he was by you when you first say the third truck, was he? A. Yes sir.

"Q. Did you see it about the same time he came by you? A. I saw it whenever he set down on his horn.

"Q. Who sat down on his horn? A. The driver of the truck.

"Q. Of the third truck? A. Of the third truck.

"Q. Is that the first you saw him? A. The first time I saw him Dell started on to the highway.

"Q. What called your attention to the third Jess Edwards truck, Mr. Hall? A. He blowed his horn.

"Q. He blowed his horn and when he blowed his horn I believe it's your testimony that you first saw him at that time and that he was 250 or 300 feet away from the intersection, is that right, sir? A. Yes sir.

"Q. When did you estimate his speed, Mr. Hall? A. You didn't have to estimate it. You could look at it and tell he was breaking the speed-limit.

"Q. When did you ascertain in your own mind, Mr. Hall, this speed that you have testified about? When did you first register that thought? A. Whenever Dell had pulled up on this highway to cross it at the intersection and that truck coming 250 feet away, at the rate of speed he was traveling I knew there was something going to happen. I couldn't keep from it if he didn't get on his brakes.

"Q. And he blew his horn? A. Yes sir.

*   *   *   *   *   *

"Q. Could you see Mrs. Foley in the car? A. Yes sir.

"Q. Did you see her look in any direction? A. She looked both ways.

"Q. You saw her looking both ways? A. Yes sir.

"Q. And you were driving along while you were observing all of this? A. Yes sir, I was watching.

"Q. Now, you tell me that you watched Mrs. Foley as she came up to the intersection; what were her actions as her automobile pulled up to the intersection? A. She just pulled up a distance from the highway and stopped and looked both ways.

"Q. How far was she from the highway when she looked both ways? A. I'd say four or five feet. Somewhere along there. No more distance than to stop and look.

"Q. I noticed on Plaintiff's Exhibit 1 that there's been a dotted or dashed line drawn from the place at Ellis's Cafe where Mrs. Foley's car pulled out and where it came to a stop at the intersection and I notice a curve in that line; does that depict the actual route that she took from the cafe? A. Yes sir.

"Q. She made that little circle and then pulled up? A. Yes sir.

"Q. How was Mrs. Foley stopped there, Mr. Hall? A. Well, I would say just the ordinary way to stop and look for—as she stopped at this intersection this truck went right in front of her.

"Q. That was the second truck? A. That was the second truck.

"Q. She stopped at the intersection and the second truck went right in front of her? A. Yes sir.

"Q. What did you see her do? A. After this second truck passed she started across.

"Q. When did she look in both directions? A. She looked in both directions when she pulled up and stopped. Just as she stopped this truck came in front of her.

"Q. Did she look again? A. She looked again.

"Q. She looked two times in both directions; is that your testimony? A. That's right.

"Q. Had you pulled off over and stopped at that time? A. Whenever I saw her coming—

"Q. Yes sir. A.—on my side of the highway from where I was at I couldn't have passed her. She had it blocked and when this driver set down

on his horn I pulled over and stopped. I said 'something was going to happen because it was running too fast.'

"Q. How far were you from the intersection when you stopped? A. I'd say I was 50 or 60 or 65 feet.

"Q. So that you were from 17 to 20 yards from the intersection; is that your testimony? A. 25 or 30 yards right back up.

"Q. Now, you say 25 yards to 30 yards. That's 75 to 90 feet, Mr. Hall. A. Yes sir. 25 or 30 yards from the intersection I was back up the highway.

"Q. Is it 50 to 65 feet or is it 65 to 90 feet you are testifying about? A. 60 to 65 feet.

"Q. And that's when you pulled over and stopped? A. Yes sir.

"Q. And where was Mrs. Foley's car when you pulled over and stopped? A. She was across the first part of the highway from the line back, and this truck was a little farther down that I was."

The witness further testified in part:

"Q. Were you able to observe the Jess Edwards Inc. truck that was involved in this collision on the 17th of January, 1956 before any of the actualy occurrence of the collision started? A. He was running 50 or 55 miles an hour.

\*  \*  \*  \*  \*  \*

"Q. Your answer was 50 to 55 miles an hour? A. Yes sir.

"Q. How fast was Mrs. Foley going when she crossed that intersection? A. Well, it couldn't have been over 10 or 15 miles an hour, to start off in low gear and cross.

"Q. Did you observe any change in the speed of this truck before the actual impact occurred from what you first saw? A. It was very little. It varied some. As he turned that curve he lifted his foot off the foot-feed.

"Q. Did you see anything which indicated to you that he applied his brakes? A. The only brake marks there were was after he turned this curve. He applied this brake.

"Q. You are getting ahead of me, Mr. Hall. Before you went down and looked at the skid-marks, just from appearances down the highway, did he appear to slow such as would indicate he put his brakes on? A. No sir.

"Q. Could his truck have gone on down the highway without hitting her if he had not turned to the right? A. Yes.

\*  \*  \*  \*  \*  \*

"Q. Now, after the collision happened what did you do, Mr. Hall? A. I had pulled my bus over, two wheels off the pavement and stopped and whenever the collision happened I only had about, not over a third of a block to drive. I drove on around to this intersection and turned right and pulled off and got out of my bus and ran to the wreck.

"Q. When it happened you put yourself about a third of a block behind the intersection? A. Yes sir.

"Q. And you went around and parked? A. Yes sir.

"Q. Did you get out and go over and look at the vehicles and look at the scene of the collision? A. I run to where Mrs. Foley was first.

"Q. Did you talk to her and observe her? A. I asked her, I say, 'Dell, are you hurt?' She says, 'I don't know. I have got a terrible hurting in my neck.'

"Q. What was her appearance to you? Don't tell me anything she said. Just what was her appearance to you

when you got up there? A. She was just as white as a sheet. She looked like to me she was pretty well shook up..

"Q. Did you look at her car? A. Yes sir.·

"Q. Was it damaged, Mr. Hall? A. As far as I can tell or could tell, outside of the motor it's a complete loss.

"Q. What parts of it were damaged? A.· All of the frame, the bed, the radiator, steering-gear.

"Q. Where in relation—all right, sir, she had a four-door car, didn't she? A. Yes, sir.

"Q. Where, in relation to the center-post of the car, was the principal part of the impact? A. In the front door.

"Q. In other words, the truck hit mainly the front door and what part of the truck was it that hit the front door? A. The bumper."

 As a reviewing court, it is our duty to consider the evidence and the inferences properly to be drawn therefrom in the light most favorable to the party obtaining the verdict, and it is our duty in considering controverted issues of fact to accept as true that testimony which tends to support the verdict. 3–B Tex.Jur. pp. 370 and 373. (This general rule also applies to cases tried without the aid of a jury.) There is another general rule to the effect that " 'the rule is well settled that the judgment of a trial court will not be set aside if there is any evidence of a probative nature to support it and that a court of civil appeals cannot substitute its findings of fact for those of the trial court if there is any evidence in the record to sustain the trial court's findings.' See Cavanaugh v. Davis, 149 Tex. 573, 235 S.W.2d 972, 977; Woodward v. Ortiz, 150 Tex. 75, 237 S.W.2d 286. See also cases collated under 4 Texas Digest, Appeal and Error, ▮▮▮ See Burrus Mills, Inc.

v. Phillips, Tex.Civ.App., 260 S.W.2d 427, 430 (no writ history); Strickland Transportation Co., Inc. v. Carmona, Tex.Civ. App., 303 S.W.2d 851; Smith v. Van Kirk, Tex.Civ.App., 314 S.W.2d 377, Pt. 1 at pages 379–380.

 Since this cause was tried without the aid of a jury, the trial court was the judge of the credibility of the witnesses and the weight to be given thereto. The court chose to believe the witness Hall, and we think the undisputed circumstances surrounding the accident immediately before the time it happened (together with Hall's testimony) is ample to sustain the implied finding of the trial court. See also In re King's Estate, 150 Tex. 662, 244 S.W. 2d 660.

We think it our duty to affirm the judgment of the trial court. See Strickland Transportation Co., Inc. v. Carmona, Tex. Civ.App., 303 S.W.2d 851. Accordingly, the judgment of the trial court is affirmed.